Good morning folks, it's good to be seated. Okay, our first case for today is Bahoboy v. Baxter International, 22L2528. We have reviewed the briefs and are familiar with the record in the case, and so you can certainly take that into account in your presentations this morning. We have allotted 20 minutes aside with an additional 10 minutes for rebuttal. So with that, we'll get started. Counsel, if you could be sure to identify yourself for the record when you step up. And a reminder, our microphone doesn't really amplify, so if you could just keep your voice down. I'll talk loud. May it please the Court, I'm Stephen Rosenberg, and I represent Scott Bahoboy, who is the plaintiff appellant in this case, which arrives before you as the result of a dismissal of a complaint based on the Code of Civil Procedure 2-615. All of us are acquainted with the de novo standard of review for 2-615, and I don't think it's necessary for me to get into that given the limited amount of time that you have. The real issue in this case, and let me make it very clear from the start what this case is not about. This is not a wrongful termination case. Counsel defendants have made it clear through 18 references in their briefs that because my client, Scott Bahoboy, was an at-will employee, they somehow have a license to do whatever they want to do to him. I have searched high and low, the casebook, here and everywhere else. There is no corollary to that. Just because someone is an at-will employee doesn't mean you can set him up to get fired. Well, what precludes you? I mean, what precludes you from, what is the limitation on an employer's right? Why are we echoing? I don't know. It used to just record. Do you know? Can you find one you might know? Yeah. Thank you. Because if he had a contract, you know, there would be an implied duty of good faith and fair dealing. And this is a real question. It's a concerning question because I think the allegations of the complaint make pretty clear he was set up to take the fall. He was. And so, what this complaint has brought in, and this addresses your question, Justice Smith, but if they had just said, Scott, you're done, that would have been the end of it. We wouldn't be here because an at-will employee doesn't have a contract, his civil rights aren't violated, that's the end of the story. But they didn't do that. They could have sent him that one message that said, you're done, you're terminated, and that would have been the end of it. We wouldn't be before you. So what we did was we drafted a complaint in three counts, none of which are termination counts, none of which. Those three counts are voluntary undertaking, legal malpractice, and the third count, which is failure to warrant a principal agent. We're not claiming that he was an at-will employee that was unfairly terminated, because your question is exactly right. We would not be here. So what we're really talking about is him being set up. Is there, because you're an at-will employee, does that cloak you with a kind of defense kryptonite that makes the company say, well, we'll do whatever we want to you? So the focus is on that period between when they started their investigation and they terminated him, what they did to him during that period. That's right. And I think what's important here is to bring to your attention, there are a couple of stunning admissions in the briefs. And the stunning admissions are as follows. They're on page 1 and they're on page 21. The first stunning is... I'm sorry. We're all sorry. Just as myself, because I've been told I'm very sorry. Maybe if I talk here? Is that better? We can hear you. You can hear me? Yeah. Awesome. The first stunning admission is on page 1 of their brief. And that stunning admission says that James Atkins, the in-house counsel for Baxter, was the chief investigator for this problem that they were investigating, this internal problem. The internal problem, and there's no need to get into all the details, but the internal problem has to do with some esoteric accounting transactions. Yes, sir. Isn't the real problem in the case is that there should have been some sort of an upturn? Sorry? Some sort of an upturn, which is quite common in an internal investigation, where the lawyer who's conducting the investigation advises the employee that he, the lawyer, represents the corporation. Sure. And that their conversation is privileged, but the privilege belongs to the corporation and can be waived by the corporation. And typically, if you need to give it up, if you're in a situation where you give it up to John Warner, you also get an outside counsel to represent the employee. But is there any civil consequence for violating that? Well, there ought to be. That's what our case is about. That's exactly what our case is about. I know, but I couldn't find a suit. I looked. I couldn't find. The treatise suggests that failure to give it up to John Warner creates an ethical issue for the lawyer who fails to give the warning. It can create problems with regard to asserting and keeping the privilege later. But I haven't found a case where it gives rise to civil liability. Well, what we're talking about here is that this entire string of events led to serious physical consequences of my client. And that's an issue that comes up in this brief under the voluntary undertaking portion. Because I have to say, Illinois is a little bit behind the curve on physical consequences. But there's no question, based on the allegations in this case, that my client suffered from depression, which in many cases, many cases, including Owens and including other cited cases in Owens, physical depression amounts to a physical harm. It's brain damage. That's really what we're talking about here. In terms of the privilege, that's never come up. Why is there even a physical injury requirement? What's the reason for it? I know the restatement sets it out, but it seems to me to be descriptive rather than a requirement. Why? Is it just a limiting principle? It's a good question. And the cases have not analyzed and gone through the physical harm requirement as other cases have. Well, it typically arises, this voluntary undertaking would arise, in many instances, in a premises liability type of case. And so it would make sense in that type of case.  In the emotional harm cases, impact cases, in the negative infliction of emotional harm, those kinds of cases. This isn't that kind of case. This isn't that kind of case. What we're talking about here, and let me get back at the risk of boring you. There are two stunning admissions. I mentioned, one, that he was the chief investigator, James Athens, for Baxter for these esoteric transactions. And number two, on page 21 of their brief, they say that my client, from the very beginning, was the focus of their investigation. Now, as a lawyer, and we're all lawyers, you would be very careful to walk into a meeting with someone who is not a lawyer, that's my client, not an accountant. He inherited this whole problem. It was going on for 20 years. You'd be very careful when you're dealing with a client like that. It's not your client, actually. When you're dealing with someone like that who's unrepresented. It has an obvious conflict. Tell him. You tell him. You know, I'm not your lawyer. If you were an independent counselor, I mean, heck, I've been in that situation myself. I've been an independent counselor. You are an independent counselor of representation. I'm not your guy. You can't rely on me. And with defense briefs, I'm sorry, I didn't mean that. No, no, no. I would just insist. It may be a completely untenable ethical situation for the lawyer, but where's the civil life? He's been damaged. He lost his job. He lost his compensation. He lost everything. He can't be hired by a public company anymore. He had a 14-year stellar record. He can't be hired. It's an injury in search of a theory of recovery. Well, there are three theories of recovery. There's a voluntary assumption of a duty, which is not to injure the person you're taking up this voluntary duty for. What are the services that were rendered as voluntary? They provided them to the lawyer. Later, but that's not where the injury comes from. The injury doesn't come from hiring Mayor Brown, but it comes from everything that happened before that. I beg to disagree with you. They sent in James Athes, who was in-house lawyer, to sit with my client during 20 hours of questioning. He did not know that he was the focus. So sending Athes with him to these meetings was the voluntary undertaking before they hired outside counsel? That's right. There were two actual episodes. Sending Athes to appear as though he was his lawyer. There is no documentation that Athes ever said to him, you know, I'm not your lawyer. I don't represent you if you want independent counsel. They gave James Sakara, who was the CFO, they gave him independent counsel. He had a lawyer from Kappa. They didn't give it to my client. So my client is sitting there thinking that, well, Athes is a guy I've known for years. I've been at the company. He must be my lawyer. They're saying, well, we're going to try to minimize this, and we're going to say he only answered a few questions. And because he only answered a few questions, and then after 20 hours of questioning, he said, well, wait a minute. Do I need my own lawyer here? And they said, well, we'll give you a couple of recommendations. The recommendation they came up with was one law firm, big law firm, good lawyer, good lawyer. A lawyer you haven't named as a defendant. And I wouldn't name him as a defendant. And I wouldn't name the firm as a defendant because I couldn't see anything they did that was wrong. What I saw was wrong was Baxter saying, we'll give you this lawyer, and guess what? We'll pay their bills. God knows what Mayor Brown's bills were for this. It was a two-year SEC investigation. Perhaps all of us. I know I have been on the other sides of those investigations. The bill was probably in the hundreds, if not millions, of dollars. Baxter says, and we'll pay those bills. We'll pay those bills if you cooperate with us. If you don't cooperate with us, we're not paying those bills. And as a matter of fact, as I wrote in a footnote in one of the briefs, when we filed this lawsuit, we were threatened with a counterclaim that said we're going to go after those illegal things. So, because you're not cooperating with us, you have to cooperate with us in good faith and put in our sole discretion whether we pay those bills. That is not a voluntary situation in which my client voluntarily goes into an SEC settlement. But Baxter said that there's nothing that Mayor Brown did that was wrong. Yes. So he wasn't injured by it. No, no. It's not that what they did was wrong. It's that my client was always under the complete and total control of Baxter. That's the problem. It's not what Mayor Brown did was wrong. You can't separate out what Mayor, I'm not saying Mayor Brown did anything wrong. It's what Baxter did. My client is sitting there. He never sees a legal bill from Mayor Brown. Never sees it. Doesn't know what they're doing. They claim to be representing him, but they're really representing Baxter. They were Baxter's outside counsel. So, my client is caught in the switches here. He doesn't really know whether he's coming or going. He's not a lawyer. He's not an accountant. He inherited this problem. This has been going on for 20 years. We really get the unfairness of this. What we're trying to figure out is where the claim is. Where are the elements of the claim? This is a voluntary undertaking. Okay. It's a voluntary undertaking. And the services that you say they voluntarily undertook were to send a lawyer into these meetings. Sent at us? That was a voluntary undertaking?  And... Okay. And then assigning Mayor Brown... Was another voluntary undertaking. And they did both of those things negligently? Yes. If assigning Mayor Brown is negligence, it would only be negligence if Mayor Brown somehow did not adequately represent his interests. Well, I will. First of all, I disagree with you. It's what was the Cardozo phrase, negligence in the air. I mean, you have to have an injury related to a violation of a duty. If that's the duty that was violated, where is the injury that stems from? Well, he didn't have a choice. He never had a choice.  Is there a tort of violating my right to choice of counsel? Is that...  Of course. What happened in the Sixth Amendment? Right to counsel? He got his own lawyer. What lawyer? If you're complaining... I just don't understand how you can say that it's negligence to go out and get an outstanding lawyer like Vince Conley, a lawyer that you say, oh, we won't quarrel with anything you did. But somehow that violated the duty and that there's an injury and damages that stem from that. But the lawyer didn't do anything though. We don't have to reach what Mayor Brown and Vince Conley did. We don't have to reach that. My client starts from zero and goes backwards. He has no idea what they're doing. That's not the issue. It's not what Mayor Brown did. What am I going to sue Mayor Brown and Vince Conley for? I'm not. That's not the point. And I apologize if I'm not making the point clearly. But what happened here was that from the very beginning, from fall of 2019, when this internal investigation... You suggest that Mayor Brown was conflicted because they were Baxter's outside counsel and they were representing your client. But you don't point to any injury that stems from that conflict. Well, obviously my client entered into an agreement with the SEC by which he didn't either admit or deny any wrongdoing. And he had to give up $125,000 and $191,000 disgorgement of his bonus. He had to do all those things. He was not in a position to do anything voluntarily. He never had the benefit of an independent accountant. He never had the benefit of an independent lawyer. He never had any of it. No one ever said to him, Baxter never said it. Baxter should have said it. You have a choice here. You need to get independent counsel. I don't have to reach the issue of the ins and outs of what Mayor Brown did on a particular day or what Vince Connelly did on a particular day. I mean, I read their will submission. I get it. I get it. We've all been there. I don't have to get into that. The point that I'm making is he never had a chance. He should have been provided. Baxter took up this whole problem and said, we're going to give you a lawyer. It's James Atlas. And he's the chief investigator for this problem. And we're assigning the guy who's investigating you, we're assigning him as your lawyer. You don't allege that. There's no allegation that they ever said to him, Atlas is your lawyer. That's correct. Okay. That's correct. However, if you look at the Meritern case and the Herbst case, H-E-R-B-E-S, you will see that no explicit contract is required. Nothing like that. No, I understand that. But at the very least, he has to believe that Atlas is his lawyer and he has to be relying on Atlas for legal advice. That's right. And that's exactly what the complaint alleges. That's exactly what the complaint alleges. What's the legal advice that you allege he went to Atlas for? The specific legal advice? He turned to Atlas for clarification of questions that were put to him by Baxter's outside counsel. Well, what were the questions? The record is devoid. We don't know. We don't have a transcript. So, was it a warrant order? Was it a warrant shortening?  What was it? No, that's the first time I've ever heard that one. Well, you said there's a request for clarification. What exactly was it? Well, okay. So, here's the situation you're facing. You're sitting there with a lawyer that the company you worked for for 14 years sits with. You go sit with this guy. So, you're sitting with this guy. You think he's your lawyer. Do you have the presence of mind to say, well, I've got to write this down and make sure this is not just a lunch order conversation? Is that where we are? No, but to establish an intern client's relationship, there has to be a request for legal advice. No, there does not. There doesn't? No, there does not. If you look at the Maritone case and you look at the Herbis case, there does not have to be a specific request for legal advice. If someone reasonably believes that they are being represented, in this case, that was the reasonable belief. At least for purposes of, let's go back, for purposes of 2-6-15. So, the restatement law governing lawyers says, at first, an intern client relationship arises when a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person, and either the lawyer manifests to the person consent to do so, or the lawyer fails to manifest a lack of consent and the lawyer knows or reasonably should know the person reasonably relied on the lawyer to provide services. So that's what the law is relative to. So there has to be, both parties have to consent effectively. That consent can be by conduct. It doesn't have to be verbally expressed.  But where is the request from your client for legal advice? How is he supposed to even know? What is he supposed to say? I want your legal advice? He's the company lawyer. He's worked with this guy for years. What's the common sense version of what's going on here? He's sitting there. He believes Athis represents him. Yes, ma'am. Was any of the conversation that was had between your client and the attorney that worked for the company divulging confidential information about strategy, about anything other than what happened in the room regarding questions that we don't know the content of? Well, you know, that's an interesting question. We don't have a transcript or notes of any such conversation. And in a sense, that supports our position. Because had my client been informed, he's a smart guy, he's an MBA, had my client been informed that this is your lawyer, then he would have been in a position to say, okay, well, these are the questions that I have. He walks into a room. They're having this investigation. There are lawyers there that he knows from his employment. Yes, ma'am. He knows that they are employed by the same company that he is employed by. Yes. And you said there's 20 hours of investigation that's going on, 20 hours of interview. That's the first three interviews. The first three interviews are 20 hours. The question that jumps out to at least me is, did they have outside conversations? It was only in the room when there was an investigation. Was there any meeting with this lawyer in the office to discuss what his position was in this investigation? Or was it just a fact-finding? You come into the room and you answer the questions. Well, we don't know. Well, your client knows because he participated in this. No, no, no. This is really a – well, this is a 2-6-15 case. I understand. But you have an allege in your complaint. You certainly have an allege. My client went to see Mr. Athus in his office prior to sitting for the interview. Well, how could we do it? It's just a follow-up on Justice Lyle's question in terms of – well, I guess you couldn't do it if it didn't happen. Of course, you couldn't allege it if it didn't happen. No, you're getting into discovery. We're not into discovery. You're getting into – we don't know what notes were taken by Athus. We don't know anything about that. We're talking about the face of the complaint, the allegations of the complaint. And the allegations of the complaint set out in 31 pages – 31 pages – distinct relationship between Athus and my client and Mayor Rahm and my client from the very beginning. If there was a duty on the part of Athus to give a warning, I don't represent you, I represent Bax, sure, wouldn't there also be a duty on the outside lawyer that was conducting the investigation for McDermott to make that same sort of warning – give that same sort of warning? It gets – yes, it gets a little diluted because my client understood that McDermott was outside counsel at the time. So – and the same guy is now general counsel for Baxter. This whole thing gets kind of entangled. But anyway, the point is that he should – your questions are accurate in a sense. What they do is support what I'm saying. There are three rules of professional conduct that address exactly what we're talking about here. Exactly. Right, but of course the rules of professional – a violation of the rules of professional conduct don't give rise to civil liability. No, they don't. And I've thought about this because I figured you'd ask me this question. They are part of the body of evidence that could be used to substantiate it. You don't have to – it doesn't – I have not alleged that because there's a violation of 1.4a or 1.7a and 1.14 and 4.7 that out of that arises a cause of action. I haven't alleged that. I knew that it was dangerous territory, and so I didn't allege it. But the fact of the matter is it can be part of the circumstances, like many other cases, where you have circumstantial evidence that shows there was a violation. And that – we have laid out, and I think it's on page 78, A through F of all the things AFIS did not say. And those things happen to be – many of those things happen to be codified in the rules of professional conduct. I mean, how do you go into a room where you know the guy is unrepresented, and you don't say anything to the guy? You don't say anything at all. How do you do that? And then you end up – you end up – he's the guy that you basically lead to the land and lead to the slaughter. That's the end product of this whole thing. We give up. We give up scotch. We pay some money, and that's the end of it. You know? So this is a voluntary – it's legal malpractice by AFIS. And – But not by the outside firm that came in and represented both of them. That's right. That's what we have to look at. And I don't know, because we're not there yet, or maybe it's somewhere in here that I missed it, if they disclosed the conflict to your client. What they did was there is an engagement letter, which is a curious piece of document. It's in the record. I don't know exactly where in the document – where in the record it is. But what they say is, we have represented Baxter.  Yeah. Here, I can – That's okay. Everything is happening. What's that? Love to be loved. Love to be loved. I can have a look. It says, Our engagement on your behalf is limited to advising the client with respect to an internal investigation by Baxter relating to alleged financial misstatements concerning foreign exchange transactions, and only to those additional specific matters which we from time to time explicitly agree to undertake. Now, as you know, the firm has represented and is currently representing Baxter in other matters. That's as far as it goes.  So that's a draft. That's all we have for Mayor Brown. It's unsigned by Mayor Brown. And then we have the undertaking, and that's from – Is it on their letterhead? Yeah. Well, no. This is not on the letterhead. This is just – and it's not dated. So it's from Vince Conley. My client signs. And then there's an undertaking for advancement of expenses, which my client signed on December 18, 2019, which is part of this Mayor Brown relationship. And it says, I understand the company has sole discretion in deciding whether to continue to advance my expenses, including attorney's fees. And I understand the condition of the company paying in advance of a determination by expenses, including attorney's fees, is my reasonable cooperation with the company and counsel, and its legal counsel, internal and external, which shall include meeting with the company legal counsel upon request to provide truthful information in the investigations, including in any subsequent civil, administrative, or other proceedings related thereto. I understand the company retains sole discretion as to which expenses, including attorney's fees, shall be indemnified. What is a reasonable person supposed to do in a situation like that? He is supposed to say, now, this guy was on track to become CFO, by the way. There's absolutely nothing in his record. What is the guy supposed to do in that situation? Say, well, you know what, Baxter? I'm on track to be the CFO, and these lawyers that you're offering me are conflicted, and I don't want them, and I don't want you to pay my bills. That's nothing. That's nowhere. That doesn't get my client anything. But that can't be the problem. The problem, if there is a problem, if there's an actionable problem, has to be in those three meetings, I think there's three, that took place before Vince Conley entered the picture, when, according to you, he acted as though Atheis was his lawyer. Because once he says, do I need a lawyer, and they say, yeah, that's kind of a bad idea, we're going to give you Vince Conley, then he knows Atheis is not his lawyer, right? At that point, he's got to know Atheis is not his lawyer. No, he can have more than one lawyer. Well, he said, do I need a lawyer, and they said, yeah. He said, do I need a lawyer, and he said, I know I don't have a lawyer. At that point, well, sure. I mean, if you have normal sensibilities, after 20 hours, as you get into the 20th hour, you're saying to yourself, wait a minute, am I the focus of this thing? You're looking at me? That's really what's going on. This isn't a case where your client entrusted to Atheis some confidence, something that he believed was covered by a privilege. I don't think my client even knows what that privilege is. I don't think he knows anything about that. I don't think we've gotten into that. We're talking about a complaint. We're talking about 2615 here. We don't know if Atheis took notes. We don't know if Baxter has notes. We don't know anything about this. This is strictly the complaint. These are the allegations. We don't know about the facts. Separate question. You filed this complaint shortly after the settlement with the SEC, correct? The SEC settlement was two years after it was in 21. So we filed this complaint initially in 23. Okay. I believe. I believe. I could be wrong on the dates, but I can go back and check that. I'm not sure. But in any event, as a lawyer, having been a lawyer for a long time, I go through this and I look at these facts, and the same thing jumps out to me all the time. How do you assign a lawyer who's doing the investigation of you, and he didn't tell you anything? That seems to me to be an actionable proposition. If you strip away everything, and we've all done a lot of briefs, and counsel has done a good job, and I think we've done a good job in laying out what's going on here, how do you justify doing something like that to someone if you're Baxter? Anyway, I know I've taken up a lot of your time. If you have any other questions. We haven't understood. We'll hear from you after we hear from our friend on the other side. Okay. Thank you, sir. Sure. Good morning, still, and may it please the Court. My name is Sean Berkowitz, and I'm here on behalf of the Appellees Baxter and James Aftis. This is a case where a plaintiff has some equitable facts that make us feel sorry for what happened to him, but there is no legal violation here whatsoever. Let me ask you, Mr. Berkowitz, if you were in the shoes of the attorney from McDermott who was conducting this investigation, would you have entered into this situation, started questioning someone very high up in the company who's obviously enmeshed in this issue that is giving rise to outside regulatory investigation, would you have questioned that person without giving an upturn more? What we are bound by. Would I have done that, Your Honor? I would have understood that Mr. Aft, Mr. Beaulieu, was aware, as is the legislative complaint, that I was counsel for Baxter. There is no allegation, and this is really important to the question, that Mr. Rosenblum and McDermott, Will and Emery were lawyers for Mr. Beaulieu. And in that situation, one can assume or infer that he was aware that they were acting on his behalf. Latham & Watkins is conducting an internal investigation. They would interview a very high-ranking member of a Fortune 250 company and not give an upturn. We would, Your Honor, and we would do that to preserve the privilege. And, of course, wouldn't, shouldn't the general counsel have undertaken to do the same thing, an abundance of caution to let this individual know, man, I don't represent you. I'm not your lawyer. I'm Baxter's lawyer. Well, we can put aside whether he, in fact, did, which is a factual question. But the complaint suggests that there was no warning. And so we assume for purposes of this complaint that there was no warning. And in that circumstance, the question is, what's the harm? And there is no civil remedy. The harm or the remedy could be a privileged one. Although even in that situation, like the typical remedy in that situation might be that Mr. Beaulieu thought the information that he was sharing, the factual information, was privileged. There is no allegation, by the way, that that was a privileged setting because even Mr. Beaulieu acknowledges that Mr. Rosenblum was not acting on his behalf. And so it wouldn't have been a privileged conversation to begin with. There are no allegations in the complaint, period, full stop, of any conversation between Mr. Athis and Mr. Beaulieu where Mr. Beaulieu shared privileged information. The complaint contains the following. Let's not lose sight of this. The complaint contains number one, in paragraph 23, an allegation that Mr. Athis clarified a few questions during the first interview. Doesn't suggest that he clarified them incorrectly or did anything misleading. Number two, the only conversation in this alleged complaint comes in paragraph 28 on page, I believe, C-44 of the record. And that conversation is, do I need a lawyer from Mr. Beaulieu, Mr. Athis? That would be advisable. And you shouldn't talk to anybody about this case other than your priest, your wife, and your lawyer. That conversation, just so I'm clear, came after how many interviews are we done? Two or three? It came after the third interview. After three interviews. So up until that point, and again, I'll follow Justice Mitchell in putting you in a hypothetical situation, you have, I'm sure, accompanied people to interviews, to grand jury investigations, to all sorts of stressful situations as a lawyer, as we all have done as lawyers. And those people sitting next to you think you're their lawyer as they're getting these hard questions. Do they not? And often you are. When I am a lawyer, they understand that I'm a lawyer. I have undertaken to agree to be their lawyer and they have asked me to be their lawyer. None of those facts are the situation here. To the contrary, to the contrary, in this situation, I have told you the two statements in the record about what Mr. Pappas did. And also remember that the complaint suggests that the questioning in the first interview was aggressive and in the second was like a deposition. There is no suggestion, those are the two allegations about what the context of it was, no allegation that I said to Mr. Pappas, I said, hey, are you my lawyer here? Can you help me? Putting aside whether Mr. Pappas had an obligation that may be under the ethics rules, right? We can talk about that. There is no allegations that anybody said, hey, you're my lawyer, let's talk about this, let's do this. No allegation of the information that was provided was inaccurate. No information that he was told to do something or say something that wasn't true. And I didn't want to cut you off. No, no, you're, I mean, I understand that there is no specific allegation that that took place, but just envisioning it from a TV show, anything else, that person sitting next to me during this questioning is my lawyer. That's how those things go down. So I may not say, hey, Justice Mitchell, are you representing me here? But we're sitting here together in this tense situation. I think I, as a non-lawyer, would think this person sitting next to me is my lawyer. So Mr. Boa Boy is an MBA. He was, at this point for four years, the treasurer of a publicly traded corporation, not some unsophisticated individual. There is, and the case law says, in order for there to be an attorney-client relationship, there has to be somebody asking and somebody saying yes. Or somebody believing, as the restatement says, that you're my lawyer, and you not saying, you know what, I'm not your lawyer. A lawyer manifests consent, or the lawyer fails to manifest a lack of consent, and the lawyer knows, or reasonably should know, that the person relies on the law. And there is no allegation that in the complaint that Mr. Appus knew that Mr. Boa Boy was relying on him. There's not an allegation to that effect. And that's what would be required. And that he would have to then act, quote, without limitation, according to the case that Mr. Rosenberg cites. And so that is not present here. But let's assume, just for a moment, that there was an attorney-client relationship, all right? There was a stunning admission, we talked about various stunning admissions in this case, when you asked counsel whether this was a wrong, this isn't a wrongful termination case. And he said, at least three times, I wrote it down, if they had just sent him a note and said you were fired, we wouldn't be here today. Right? If that's all that had happened. And so, where's the causation of anything that happened here? In other words, where's the approximate cause or the but-for cause of what happened here? Now, keep in mind that we're focused, for the purpose of this complaint, on a one-month period where three interviews that totaled 13 hours, 16 hours, 7 hours for the first, 6 for the second, 3 for the third, according to the complaint, took place. A month later, I'm sorry, within a week after the other one, he gets his homeboy, Vince Connelly of Mayor Brown. And there was another admission acknowledgement. And Mayor Brown did nothing wrong. And so, for two years, and Mayor Brown... Counsel, did he get his own lawyer? I'm sorry? Did he get his own lawyer? Or did the company say, we're getting a lawyer for you. Here he is, right here. He got his own lawyer. The company recommended... He sought out... Counsel, and the company paid for counsel, which is not unusual. And he sought out and however he came to be represented by a firm that also was representing Baxter. You know, unrelated matters. Nothing wrong with that. And I didn't... We're not talking about right or wrong right now. We started with wrong earlier. I'm saying, did he seek and obtain counsel, or was this the counsel that was... This was the firm that he was referred to for... What the complaint says, Your Honor, is that when asked if he needed a counsel, Mr. Affis responded it would be a causable, and he gave him the name of Vince Connelly. There is apparently an engagement letter that's not on the record that counsel is reading from. What is in the record is that the draft that was in his possession advised Mr. Beaubois that Mayor Brown had done work in the past and was currently doing work for them. And so there was at least information in his possession about those facts. Well, I was just concerned, and I heard you say that he obtained counsel. And so I just wanted to clarify the manner in which that happened, whether it was all voluntary on his part, going out to the free market and just picking a lawyer out of a phone book, or someone said, here's the guy. Yeah, there is no dispute that Mr. Connelly and Mayor Brown were recommended to him. He chose to let them represent him for two years, and when he says they didn't know what was happening, they had an attorney-client relationship. There's no dispute about that, and they worked together for a long period of time. It was four months before Mr. Beaubois was terminated, over four months into the relationship with Mayor Brown. Mayor Brown chose to bring him in to answer questions. The complaint suggests he denied involvement in these various issues with Mayor Brown. Then over the course of two years after he was fired, Mayor Brown brought him in twice to the SEC to answer questions. Advised by Mayor Brown, Mr. Beaubois entered into a settlement with the SEC where there was a finding that he committed securities fraud, even though there was no admission or denial on his part. There was a finding. And so where I started this was, there is no but-for causation. We're talking. Yes, Your Honor. I want to respond to that, where the injury is, or at least give you a response so that you can respond to my response. I mean, I think the allegation is what happened in these interviews, particularly the pre-Vince Conley interviews, because that's what I would focus on, is he gave them the ammunition to set him up to take the fall. I think that's the allegation. And there were certainly economic damages from him being set up to take the fall. So there are allegations that are without specificity that he was set up to take the fall, very similar to the Ford v. Miller case. In that case, a supervisor at a Ford plant was involved in a situation where Ford fired him because of sexual activity that was going on. He claimed not to have known about it. He said, I was set up to be the fall guy there. And the Illinois Appellate Court, in that case, said there is no fall guy exception or bad investigation exception in those circumstances because you weren't half the employee. Here, there are no allegations of specific... I'm not saying that gives him a claim. I'm saying those are his damages. Now, if he has a malpractice claim, because this was his lawyer, and his lawyer was giving him bad advice, and negligent advice, then his damages, which is what you asked about, are because of that bad lawyer advice, I was set up to be the fall guy. So that wouldn't be something that he could recover under a voluntary undertaking? I'm saying under malpractice. So going to malpractice, the allegations are that he was set up to be the fall guy, suffered some pecuniary damages, and he says, I would have gotten a severance package. I would have gotten three more years of employment. I wouldn't have settled with the SEC. Let's talk about each of those, because those are not but-for damages in this case. He was an at-will employee. If he had counsel and refused to speak to the company, it is more than a fair inference that he would have been terminated. He's not cooperating in an investigation, period, and exploited. The at-will case talks about people not cooperating and not... When your treasurer says, hey, I'm not going to answer questions about this stuff, you're likely to get fired for an at-will employee. With respect to the... And so there really are no damages. It's totally speculative. And the case law says you can't have speculative damages. But, hey, if I had gotten good advice, I wouldn't be in this situation. If he had gotten advice from a counsel that said, you're in trouble, don't talk, it would have been like that. Number two, with respect to the SEC settlement, he did have counsel for two years. He went in and testified twice to the SEC. There was no allegation. In fact, there is a contrary. There's an acknowledgment, as Judge Donnelly found, that Mr. Atkins had nothing to do with advice on the SEC case. His sort of time in this picture ended in October of 2019 when he said you should get your own counsel. And so we're now, almost two years later, two more interviews with Mr. Connolly and the SEC, where Mr. Boakye enters into a settlement where he pays $125,000. Baxter paid $18 million as a result of this. I mean, there's no fallback situation in that sense, right? Baxter was responsible for Mr. Boakye's conduct. Everybody would have been thrilled if nothing wrong had occurred here. Baxter didn't voluntarily pay $18 million to set up Mr. Boakye. And so you're looking at a broken chain of events here between the conduct that ended in October of 2019 and the ultimate harm of the SEC resolution. When represented by his own counsel, who did nothing wrong? And I think there's no allegation that anything wrong represented his interests, brought him in and attempted to explain the situation. There's also allegations, by the way, that the individual, Mr. Shaw, who worked for Mr. Boaboy, testified that Mr. Boaboy was the one who directed him to enhance these transactions. That's in the complaint as well. And so one would assume a lawyer would have brought him in to testify to deny those allegations. And so this isn't a situation where he was hoisted by his own baton. There were other individuals pointing the finger at Mr. Boaboy for doing wrong. That individual, Mr. Shaw, was also part of the settlement. The assistant treasurer reported to Mr. Boaboy. And so when we're talking about causation, that causal link, that is something that is critical. He had a lawyer for two years, his own lawyer, after Mr. Atlas exits the picture. The concept that Mr. Atlas, by clarifying a few questions and telling him to get a lawyer and recommending a lawyer, committed malpractice, that's not malpractice. There's nothing suggesting that he told him that he was wrong in what he told him about the clarification or that he answered the question about whether he needed a lawyer in a wrong way. The fact that Mr. Boaboy asked Mr. Atlas if he needed a lawyer belies the suggestion that he thought Mr. Atlas was his lawyer. And so in that sense, it also undercuts the credibility of him thinking in a world where he was aggressively questioned, where he sat for what he felt was a deposition, that he was relying on him for legal advice, that there are no allegations that they individually talked or met or conferred on these issues. This is a case where counsel is asking you all to dramatically expand the rights of an at-will employee, both in a voluntary undertaking sense, with no physical injury, and we haven't even talked about the duty to warn, where it's not even recognized in Illinois tort, and we're left with the purported malpractice claim where there are significant questions about whether the mere addressing of questions and telling him he needs a lawyer constitutes it, all of which are against the backdrop of an entire lack of causation attributable to the three interviews where he was sitting. And so to the extent that there's a concern about John warning, I think Your Honor's point that they have pointed to no civil remedy for that situation is absolutely right. There could be a privilege issue or question, Mr. Rosenblum was never alleged to have been acting on behalf of Mr. Volovoi, and so even those conversations wouldn't have been privileged. There's a reason that the trial judge here, Judge Donnelly, let counsel attempt to re-plead this four times. We went back and forth and over and over. This case was first filed within a month of the settlement with the SEC. That happened in February of 22. The case was filed in March of 2022. We've been at this a long time. There has been ample opportunity to make allegations of an actual, legally cognizable claim. We have a lawyer here, Mr. Appus, who is suffering under the specter of this case that has been overhanging him for some time despite the fact that a judge on four separate occasions has found that there is no claim that has been made, and we would respectfully ask that Your Honors in looking at this de novo agree with the bases of the lower court, and I'm happy to answer or address any other questions. Okay. I think you've answered the questions we have, so thank you for your presentation. Counsel? Thank you. If Sean Berkowitz or I were sent to accompany Scott Boboy, we sure as heck would have said, Hey, Scott, I don't represent you. You've got to get your own lawyer. There was a suggestion after he asked, after the third round of interviews after 20 hours, Do I need my own lawyer? He said, Yeah, I'll recommend a couple. He came back the next day and he says, Mayor Brown. Okay. You know, he said what? He said what was interesting is he said, Well, Appus has been suffering under this for a long time. Well, I'm sorry, but he deserves to suffer. He should have told him right from the start. You've got to get your own lawyer here. I'm not the guy. I'm just not the guy. The issue of but for, that's a fact question. That's a fact question. We're talking about the allegations of a complaint. Counsel is talking about causation. Causation is a fact question. You need to build up a record of facts. We don't have a record of facts. We have a record of allegations. That's what 2615 is all about. I'd like to draw your attention to what counsel claims are mere clarifications. I think that is the most euphemistic way of putting what they were doing. What is a clarification? I mean, if I go to a lawyer and I say, I'd like you to clarify. It could be a clarification of an accounting term. That wouldn't be within a legal representation. I asked before, it could be a clarification of a lunch order. Because you failed to allege what the subject matter of the clarification was, What are we to make of that? Or just draw the worst possible inference? What you're to make of that is that this is a complaint. It's not facts. It's uncovered and discovered. This is a fact. This is a complaint that is judged on a de novo basis. If all the pleadings are taken, all the inferences from the pleadings are taken in the light most favorable to the plaintiff. That's what this is about. With respect to this Scheibel fellow, that's a distraction. My client claims that Scheibel was not telling the truth. He never directed anybody to do anything with respect to these FX transactions. My guy was 18 million bucks for Baxter, by the way, as a drop in the bucket. Scheibel had to pay. My guy had to pay. Sacano, the CFO, didn't have to pay. Almeida didn't have to pay. PwC, who blessed these transactions for decades, didn't have to pay. So my guy got caught in the switches. And this is what the case is all about. And based on the allegations of the complaint, based on the standards of 2615, we would ask you to reverse the order by Judge Dowling. Thanks very much for your time. Okay. Thanks, Amash. The matter taken under advisement for study and opinion. We thank you for your excellent briefing and your arguments today. It was very helpful. With that, we'll take a short break before our next case. I know we're a little behind, but we'll be back very shortly.